IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OVERTON WAYNE PAULEY, on<br>behalf of Asatru/Odinist Faith<br>community; WILLIAM RAY RHOADES, | ) <br> ) <br> ) |
| | ) |
| Plaintiffs | ) Case No. 1:15-cv-158 Erie |
| | ) |
| vs. | ) |
| | ) RICHARD A. LANZILLO |
| CHARLES E. SAMUELS, JR, | ) UNITED STATES MAGISTRATE JUDGE |
| BOBBY L. MEEKS, HOWARD | ) |
| BARRON, DOUG BAILY, RICHARD | ) |
| GLOGAU, BRIAN GRIMM, | ) MEMORANDUM OPINION ON |
| TINA SWANSON, SIS LT. MR. | ) DEFENDANTS' MOTION FOR |
| ASHLEY, DAN BOYER, | ) SUMMARY JUDGMENT |
| | ) |
| Defendants | ) ECF NO. 95 |
| | ) |

I.    Introduction

Plaintiffs Overton Wayne Pauley (Pauley) and William Ray Rhoades (Rhoades) are

Odinists. That is, they are adherents to Odinism, which Pauley described as "an ancestral folk

religion." ECF No. 99-1, at 7. This religion is also known as "Asatru" or "Wotanism." *See,*

*e.g., Karow v. Fuchs,* 695 Fed. Appx. 966 (7th Cir. 2017) (Rovner, J., *dissenting), Rivera v.*

*Kernan*, 2018 WL 4680191, *2 (N.D. Ca. Sept. 28, 2018).[1] Pauley and Rhoades filed a lawsuit

in which they allege that various officials of the Federal Correctional Institution at McKean (FCI

McKean) violated their constitutional and statutory rights relating to the exercise and practice of

their faith. The remaining Defendants have moved for summary judgment. After a thorough

---

[1] A more in-depth discussion of Odinism/Asatru, its practices, and rituals can be found in *Gregory v. Pfister,* 2019
WL 3287873, *1 (E.D. Ill. July 22, 2019) and *Kilgore v. Gordy*, 2018 WL 4856778, *1, n.1 (N.D. Ala. Sept. 19,
2018).

review of the summary judgment record, the Court finds that no genuine issue of material fact remains for trial and that the Defendants are entitled to judgment as a matter of law as to the Plaintiffs' remaining claims. The Court will therefore grant the Defendants' motion.

II.     Procedural History

Pauley, Rhoades, and six other inmates who were members of the Odinist faith community at FCI McKean filed this action in the Court of Common Pleas of McKean County, Pennsylvania. Their Complaint asserted that the United States Bureau of Prisons (BOP)—more specifically, the BOP's Chaplaincy Services—had failed to afford them adequate time, tools, resources, and funding to practice their religion. *See* ECF No. 99-1, p. 22-23. The Defendants removed the case to this Court on June 23, 2015. ECF No. 1. As defendants, the Plaintiffs initially named Charles E. Samuels, Director of the Federal Bureau of Prisons, and the following thirteen staff members at FCI McKean: Bobby L. Meeks, Warden ("Meeks"); Howard Barron, Assistant Warden ("Barron"); Doug Bailey, Captain ("Bailey"); Richard Glogau, Supervisor Chaplain ("Glogau"); Brian Grimm, Assistant Chaplain ("Grimm"); Scott Wilson, BB Unit Manager ("Wilson"); Keith Williams, DA Unit Manager ("Williams"); T. Smith, BB Unit Case Counselor ("Smith"); Chase Farrell, DA Unit Case Manager ("Farrell"); Tina Swanson, Budget Analyst ("Swanson"); SIS Lt. Mr. Troublefield ("Troublefield"); SIS Lt. Mr. Ashley ("Ashley"); and Dan Boyer, SOR ("Boyer"). The Plaintiffs claimed violations of the Religious Land Use & Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq.; the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, et seq.; and the First, Fifth, and Fourteenth Amendments to the Constitution, pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). They sought injunctive relief and punitive damages. All parties consented to the jurisdiction of a United States Magistrate Judge

2

over the matter. ECF Nos. 8, 10, 11, 12. *See also* 28 U.S.C. § 636(c)(1). Five of the original plaintiffs were voluntarily dismissed from this action by an order dated December 1, 2015. ECF No. 24.

The remaining Defendants moved to Dismiss the Complaint. ECF No. 13. This Court granted—in part—the Defendants' motion in September of 2016. ECF No. 37.[2] As a result, two categories of claims remain: (1) Pauley and Rhoades' First, Fifth, Eighth, and Fourteenth Amendment claims against Defendants Glogau, Grimm, Swanson, Ashley, Boyer, Samuels, Meeks, Barron, and Bailey; and (2) Pauley and Rhoades' RFRA claims against Defendants Glogau, Samuels, Meeks, Barron, and Bailey.

After a period of discovery, the remaining Defendants moved for summary judgment on December 21, 2018. ECF No. 95. Their motion was accompanied by a supporting brief (ECF No. 96) and a Concise Statement of Material Facts (ECF No. 97). In response, Pauley filed a "Statement of Undisputed Factual Issues" (ECF No. 109) as well as a "Notice to Defendants to Withdraw their Motion for Summary Judgment," which the Court and the Defendants have construed as his Response in Opposition to Summary Judgment. ECF No. 113. Pauley also filed a "Request to Take Judicial Notice," which included seventeen exhibits. ECF No. 114. The Defendants filed a Reply in support of their motion and a Response to Pauley's statement of

---

[2] On September 29, 2016, this Court granted Defendants' motion to dismiss certain of the Plaintiffs' claims as follows: Plaintiff Thompson's claims were dismissed due to his failure to exhaust administrative; Plaintiffs' claims against Defendants Samuels, Meeks, Barron, Bailey, Wilson, Williams, Smith, Farrell, and Troublefield were dismissed for their lack of personal involvement in the alleged violations; Plaintiffs' RLUIPA claim was dismissed; and Plaintiffs' RFRA claims against Defendants Grimm, Swanson, Ashley, and Boyer were dismissed. ECF No. 38. The remaining Plaintiffs (Pauley and Rhoades) asked the Court to reconsider its dismissal of the claims against Defendants Samuels, Meeks, Barron, and Bailey. ECF No. 41. The Court reconsidered its prior order and reinstated the Plaintiffs' claims against these Defendants on April 7, 2017. *See* ECF No. 50.

undisputed facts. ECF No. 128. Rhoades did not respond to the Defendants' motion or supporting submissions.[3]

Having failed to respond to the Defendants' motion or engage in any docket activity since October 2, 2015, *see* ECF No. 12, it is apparent that Rhoades has abandoned his claims. The Defendants ask that Rhoades' claims be dismissed for a failure to prosecute. ECF No. 128, pp. 2-3. But because Rhoades is proceeding pro se, and lacking any explanation for his nearly four years of docket inactivity, the Court cannot discern whether his failure to prosecute is willful or in bad faith. *See Hildebrand v. Allegheny*, 923 F.3d 128, 135 (3d Cir. 2019). Instead, because Rhoades did not respond to the Defendants' Concise Statement of Material Facts (ECF No. 97), the Court will treat the facts stated therein as undisputed for purposes of resolving their motion as it relates to Rhoades. *See, e.g., Williamson v. Link*, 2019 WL 3202515, *1 (E.D. Pa. July 15, 2019) (citing Federal Rule of Civil Procedure 56(e)(2)).

The Court also notes that Pauley has failed to comply with Local Rule 56.1. This rule requires a party opposing a motion for summary judgment to file a response to the movant's concise statement of material facts and, with proper citation to the record, admit or deny the facts stated in the corresponding paragraphs of the movant's concise statement, and in separately numbered paragraphs, set forth any other facts material to the motion. *See* LCvR 56.C.1. Courts in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56. *See, e.g., Coleman v. Tice*, 2018 WL 5724125, at *2 n. 3 (W.D. Pa. Oct. 10, 2018); *First Guard Ins. Co. v. Bloom Services, Inc.*, 2018 WL 949224, at *2-3 (W.D. Pa. Feb. 16, 2018); *Hughes v. Allegheny County Airport Authority*, 2017 WL 2880875, at *1 (W.D. Pa. July 6, 2017).

---

[3] The docket also records that several mailings sent to Rhoades at his address of record were returned to the Court as undeliverable. *See, e.g.*, ECF No. 57, ECF No. 59, ECF No. 60.

A non-moving party "faces severe consequences for not properly responding to a moving party's concise statement." *Hughes*, 2017 WL 2880875, at *1. Any alleged material facts "set forth in the moving party's Concise Statement of Material Facts ... which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E. While courts apply procedural rules to pro se litigants with some leniency, they are not free to ignore procedural rules that apply to parties assisted by counsel. *McNeil v. United States*, 508 U.S. 106, 113 (1993) (explaining that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"). Accordingly, any properly supported factual statements in the Defendants' concise statement of material fact to which Pauley has failed to respond will be deemed admitted. LCvR 56.E. Even so, the Court will consider any facts properly alleged in his pro se responses that specifically contradict Defendants' statements of fact, to the extent that they are supported by the record. *Boyd v. Citizens Bank of Pa., Inc.*, 2014 WL 2154902, at *3 (W.D. Pa. May 22, 2014) (stating that "[t]o the extent Plaintiff's statement of 'fact' specifically controverts Defendant's, the Court will consider these facts in determining whether summary judgment should be granted"). Pauley was also deposed and his deposition is a matter or record. *See* ECF No. 99-1. Where appropriate, the Court will also note his deposition testimony. With that in mind, the Court turns to the factual background.

III.    Factual Background

Pauley and Rhoades are adherents to Odinism. *Id.* at 23, 52; ECF No. 99-2, 16:13-16. They described Odinism as an "ancestral folk religion" which requires them to hold, among other things, outdoor festivals every month. *Id.* at 37-39, 45-46; *id.* at 23-24. According to

5

Rhoades, the four main festivals of the religion take place on the winter, spring, summer, and fall equinoxes. ECF No. 99-2 at 32-33. One of the primary symbols associated with the faith is a "solar wheel," which Pauley described as a "rounded swastika." ECF No. 99-1 at 46. The religion has no "bible" but several books guide the faithful in their practices. *Id.* at 30. FCI McKean bought many titles for its Odinist inmates. ECF No. 97, ¶ 33. Pauley also authored a book on Odinism entitled "The Path of Wotanisms' Beginners Handbook: Faith, Community, Purpose, and Guidelines." ECF No. 99-1, 52. Pauley testified that his handbook was the only text needed by Odinists at FCI McKean to practice their faith. *Id.* at 58. Pauley's monograph contains a section called "Wotansvolk Ethnic Philosophy," which instructs adherents to have pride in the "Aryan" or "white" race, stating: "It is to the advantage of every race to conserve its own unique ethnic purity." ECF No. 97, ¶ 36.

The BOP has a program statement on congregational worship practices in its facilities. The regulation in question, BOP Program Statement 5360.09.7.a, states:

> The level of scheduled activities is expected to be commensurate with the institution's mission/need. Authorized congregate services will be made available for all inmates weekly with the exception of those detained in any Special Housing Units (SHUs). If a state of emergency exists (e.g. fog, institution lock down, food strike), the warden or designee will determine the appropriate level of chapel programming.

*See* ECF No. 97, ¶¶ 18-20. Under this regulation, FCI McKean permitted the Odinists two religious services per week, the same number of services allotted to every other religious group in its confines. *Id.*, ¶ 37. These were held indoors in the prison chapel. *Id.* The institution also gave the Odinists twelve (12) outside services per year (once a month), on a date of their choosing. *Id.*, ¶ 38. FCI McKean permits its Odinists to have religious fires, maintain an altar, worship circle, and other things such as stones and logs in the outside worship area. *Id.*, ¶ 41.

The institution also permits the observance of a ceremonial meal by a religious group once a year. *Id.*, ¶ 65. Pauley acknowledges that Odinism has no dietary restrictions: "we eat what we want." ECF No. 99-1, p.32. Rhoades characterized the Odinist diet as "meat-heavy," with meat generally eaten as part of the "Yule" meal at the end of the year. ECF No. 99-2, 50.

The prison has also purchased a number of items sacred to its Odinist population. For example, the prison obtained a "Blot Bowl," "Ash Wood Ruins, (sic)" an "Oath Ring," a "Thor's Hammer," a drinking horn, and apple juice and honey from which to make mead.[4] ECF No. 97, ¶ 75. Pauley also stated that the "majority of the tools" that the Odinists need to practice their faith "can easily [be] made in the prison shops." ECF No. 99-1, 119. The chaplain at FCI McKean, Defendant Glogau, requested that the prison's carpentry shop fashion a set of runes, a Thor's hammer, an Oath ring, a gander stick, and two bowls for the Odinists to use in their worship ceremonies. ECF No. 97, ¶ 78. These are but some of the many accommodations FCI McKean has made for its Odinist inmates. The impetus for this lawsuit, however, is the Defendants' alleged refusal to provide the Plaintiffs with additional accommodations, various religious items, and funding to practice their religion. The Defendants have moved for summary judgment.

---

[4] As one Court explains, "Mead is a mixture of water and honey sometimes with fruit juice or spices and wine yeast. The BOP prohibits inmates from consuming alcohol due to security concerns that increased violence otherwise might result. In addition, the prohibition of alcohol serves the penological concerns of furthering the rehabilitation of inmates with histories of substance abuse, deterring criminal behavior, and punishment. The BOP permits the religious use of wine in instances where it is specifically mandated by religious law, such as during the Catholic Eucharist. In such situations, however, only the clergyman is allowed to hold the chalice while inmates dip their communion wafers into the wine and then eat the wafers. Inmates are never permitted to handle the sacramental wine themselves or to drink the wine directly. Asatru religious ceremonies involving mead require the participants to handle the mead themselves by toasting each other with the mead and then drinking the mead. Therefore, BOP cannot provide Asatru practitioners with any alcoholic alternative that would accommodate its security concerns in allowing inmates to handle and to drink alcohol. As a result, it provides Asatru adherents with the honey and fruit juice mixture plaintiff describes as an alternative to alcoholic mead." *Godbey v. Wilson*, 2014 WL 794274, *2 (E.D. Va. Feb. 26, 2014) (quotations and citations omitted).

7

IV. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires a court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

In determining whether a genuine issue of material fact remains for trial, the court must consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To defeat a properly supported motion for summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings but must identify evidence that demonstrates the existence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Furthermore, the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The moving party may

also rely upon the absence of evidence to support an essential element of the opposing party's claim as a basis for the entry of summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

V.      Analysis and Discussion

        A.      Plaintiffs' Claims for Injunctive Relief are Moot.

        Pauley and Rhoades have asked for equitable relief in the form of a preliminary injunction. *See* ECF No. 1-1, p. 7-9. At their depositions, both Plaintiffs testified that the allegations underlying their Complaint took place while they were incarcerated at FCI McKean. For example, when asked about the incidents underlying his Complaint: "we're talking about McKean here, correct?" Pauley answered "yes sir." ECF No. 99-1, p. 19. Rhoades similarly testified that the basis for his claims relate to his time at FCI McKean. ECF No. 99-2, p. 18. Defendants also note in their concise statement of material facts that Pauley and Rhoades both testified that the allegations in this lawsuit are limited to incidents that took place during their period of incarceration at FCI McKean. *See also* ECF No. 97, ¶ 17. Rhoades testified, however, that he was released from federal custody on November 28, 2016. ECF No. 99-2, p. 6. Pauley remains in federal custody, but stated that he was transferred to FCI Estill on April 18, 2017. ECF No. 99-1, p. 6; ECF No. 114, p. 3.

        As the Third Circuit explained, "It is axiomatic that the federal courts may not decide an issue unless it presents a live case or controversy." *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993) (citing *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 810–11 (3d Cir. 1989) ("Federal courts, having jurisdiction only to decide actual cases and controversies, are 'without

the power to decide questions that cannot affect the rights of litigants in the case before them.'").

That Pauly and Rhoades are no longer incarcerated at FCI McKean renders their claim for injunctive relief moot. Summary judgment is therefore granted on the Plaintiffs' claims for injunctive relief. *See Fortes v. Harding*, 19 F. Supp. 2d 323, 326 (M.D. Pa. 1998) (internal citations omitted) ("[a] plaintiff's transfer to another institution moots any claims for injunctive or declaratory relief.").

    B.    Constitutional Claims: Plaintiffs' Claimed Violation of the First, Fifth, Eighth, and Fourteenth Amendments against Defendants Glogau, Grimm, Swanson, Ashley, Boyer, Samuels, Meeks, Barron, and Bailey.

Given the mootness of their request for injunctive relief, the only question remaining in this litigation is whether the Plaintiffs are entitled to monetary damages from the remaining Defendants in their personal capacities under either *Bivens* or the RFRA. Although Plaintiffs' Complaint asserts generally that the Defendants violated their rights under the First, Fifth, Eighth, and Fourteenth Amendments, it does so without factual allegations to support the alleged constitutional infractions. [5] As did the Defendants, the Court will look to the Plaintiffs' deposition testimony and other evidence in the record to fill in the gaps. *See, e.g., Quezada v. Roy*, 2015 WL 5970355, *11 (S.D.N.Y. Oct. 13, 2015) (motion for summary judgment decided on the basis of the allegations of the plaintiff's complaint, as "fleshed out in the plaintiff's deposition," consideration of which "allows plaintiff (who may be an unsophisticated litigant) to fill in the gaps in his pleading."); *see also Prince v. Rice*, 570 F. Supp. 2d 123, 128 n.1 (D.D.C. 2008).

---

[5] Plaintiffs state that Defendants have violated their rights under the Fourteenth Amendment, but because they are (or in Rhoades' case, were) federal prisoners, the applicable basis for their claim is the equal protection principles read into the Fifth Amendment. *See, e.g., Caldwell v. Beard*, 324 Fed. Appx. 186, 189 (3d Cir. 2009) (due process clause under the Fifth Amendment protects against federal governmental action); *Nguyen v. United States Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983) ("The limitations of the Fifth Amendment restrict federal governmental action. . ."). Thus, the Plaintiffs cannot maintain a Fourteenth Amendment claim against the Defendants and the motion for summary judgment on those claims will be granted accordingly.

10

Pauley and Rhoades purport to anchor their constitutional claims in *Bivens*. The Third

Circuit has instructed that the question "[w]hether a *Bivens* claim exists in a particular context is

'antecedent to the other questions presented,'" cautioning that "it will often be best to tackle head

on whether *Bivens* provides a remedy, when that is unsettled." *Bistrian v. Levi*, 912 F.3d 79, 88

(3d Cir. 2018) (citing *Hernandez v. Mesa*, --- U.S. ---, 137 S. Ct. 2003, 2006-07 (2017)). This a

threshold determination because "[a]ssuming the existence of a *Bivens* cause of action—without

deciding the issue—can risk needless expenditure of the parties' and the courts' time and

resources." *Id.* at 89. The Court will therefore consider whether a *Bivens* cause of action exists

for each claim at issue and will begin with a discussion of the analytical framework for making

such a determination.

      1.    Constitutional Claims and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Congress established a damages remedy under 42 U.S.C. § 1983 against state officials for

constitutional violations but it did not create a corresponding statute for damages against federal

officials. *Karkalas v. Marks*, 2019 WL 3492232, *6 (E.D. Pa. July 31, 2019) (citation omitted).

In *Bivens,* however, the United States Supreme Court recognized an implied right of action for

damages against federal officials who have violated a person's Fourth Amendment rights. 403

U.S. 388. That claim was not based on either an expressed or implied statutory authorization to

sue, but instead was grounded in the Constitution itself. The Supreme Court extended a *Bivens*

remedy twice: in *Davis v. Passman*, 442 U.S. 228 (1979), where it held that an administrative

assistant fired by a congressman had a *Bivens* remedy for her Fifth Amendment gender

discrimination claim, and in *Carlson v. Green*, 446 U.S. 14 (1980), where the Court permitted a

*Bivens* remedy against federal prison officials for failure to treat a prisoner's asthma. The

Supreme Court has not overruled *Bivens* but also has not extend it. Instead, the Court has

expressly confined *Bivens* actions to the limited range of claims previously recognized. *See Corr. Srvs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (referring to *Bivens* as a "limited holding."). The Court recently reaffirmed this holding in *Ziglar v. Abbasi*, stating that these three cases are the "only instances in which the Court has approved of an implied damages remedy under the Constitution itself." --- U.S. ---, 137 S. Ct. 1843, 1855 (2017).

In *Ziglar*, the Supreme Court reviewed *Bivens* claims asserted by individuals detained on immigration violations at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, after the September 11, 2001 terrorist attacks. These detainees sued former Attorney General John Ashcroft, former FBI Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar (referred to by the Supreme Court as the "Executive Officials") challenging the official policies that caused their detention.[6] They also brought claims challenging the conditions of confinement at the MDC. *Id.* at 1852–53. The detainees alleged violations of the substantive due process component of the Fifth Amendment, the equal protection component of the Fifth Amendment, and the Fourth Amendment, grounding their claims in *Bivens*. *Id.* at 1853-54. They also alleged the prison warden permitted MDC guards to abuse them. *Id.* at 1854. The primary issue before the Supreme Court was whether *Bivens* provided a remedy for damages against the Executive Officials and prison wardens. *Id.*

The Supreme Court observed that *Bivens* was decided during an "ancien regime," in which "the Court assumed it to be a proper judicial function to 'provide such remedies as are

---

[6] "[M]ore than 700 individuals were arrested and detained on immigration charges. If the FBI designated an alien as not being 'of interest' to the investigation, then he or she was processed according to normal procedures.... If, however, the FBI designated an alien as 'of interest' to the investigation, or if it had doubts about the proper designation in a particular case, the alien was detained subject to a 'hold-until-cleared policy.' The aliens were held without bail." *Ziglar*, 137 S. Ct. at 1852.

12

necessary to make effective' a statute's purpose."[7]  *Id.* at 1855 (citations omitted). Noting that

"expanding the *Bivens* remedy is now a 'disfavored' judicial activity," the Supreme Court

instructed federal courts to exercise caution before extending the remedy to claims that are

meaningfully different than "the three *Bivens* claims the Court has approved in the past ...."  *Id.*

at 1857, 1860 (citing *Bivens*, 403 U.S. 388; *Davis*, 442 U.S. 228; *Carlson*, 446 U.S. 14).  The

Court then concluded that the detention policy claims against the Executive Officials were not

properly brought because "a *Bivens* action is not a proper vehicle for altering an entity's policy."

*Id.* at 1860 (internal quotation marks omitted).  The abuse claim was remanded to the Court of

Appeals for the Second Circuit for consideration whether extending *Bivens* to such claims was

appropriate in light of the identified "special factors."  *Id.* at 1869.

As one jurist aptly explained,

> *Ziglar* created a funnel through which plaintiffs alleging
> constitutional violations by federal officials must pass. First,
> federal courts must determine whether the cause of action presents
> a "new context" for *Bivens* cases. If it does, courts must then
> determine whether alternative remedies exist. Finally, and most
> critically, courts must determine whether there are special factors
> counselling against extending the *Bivens* remedy to the new cause
> of action.

*Alexander v. Ortiz*, 2018 WL 1399302, \*4 (D.N.J. Mar. 20, 2018) (Simandle, J.).  *Accord Jacobs*

*v. Alam*, 915 F.3d 1028, 1037 (6th Cir. 2019) ("For our purposes, *Ziglar* clarifies the analytical

framework for how courts must approach asserted *Bivens* claims.").

As *Ziglar* makes clear, "[t]he proper test for determining whether a case presents a new

*Bivens* context is as follows.  If the case is different in a meaningful way from previous *Bivens*

---

[7] The term "ancien regime" refers to a "political or social system that has been displaced, typically by one more modern; a system or mode no longer prevailing." *Ancien regime, Merriam-Webster Dictionary* (On Line Ed., 2019).

13

cases decided by this Court, then the context is new." --- U.S. ---, 137 S. Ct. at 1859. The Court

explained:

> A case might differ in a meaningful way because of the rank of the
> officers involved; the constitutional right at issue; the generality or
> specificity of the official action; the extent of judicial guidance as
> to how an officer should respond to the problem or emergency to
> be confronted; the statutory or other legal mandate under which the
> officer was operating; the risk of disruptive intrusion by the
> Judiciary into the functioning of other branches; or the presence of
> potential special factors that previous *Bivens* cases did not
> consider.

*Id.* at 1860. This inquiry is usually easy to satisfy. *Id.* at 1864, 1865. As to the subsequent

inquiry, the Court instructed that

> the inquiry must concentrate on whether the Judiciary is well
> suited, absent congressional action or instruction, to consider and
> weigh the costs and benefits of allowing a damages action. Thus,
> to be a "special factor counselling hesitation," a factor must cause
> a court to hesitate before answering that question in the
> affirmative.

*Id.* at 1857-1858. With these instructions in mind, the Court turns to the Plaintiffs' claims.

> a. Summary Judgment will be granted to Defendants on Plaintiffs'
> First Amendment Retaliation Claim.

Pauley and Rhoades bring what the Court construes as a First Amendment retaliation

claim against Defendants Ashley and Glogau.[8] The Complaint charges that "petitioner Overton

W. Pauley was called to the Lieutenant's office & threatened that he would be placed into

segregated custody if he did not stop pursuing legal remedies against the crimes being committed

on this inmates [sic] faith groups [sic] right to practice religion." ECF No. 1-1, p. 3. The

---

[8] Defendants correctly point out that, given the paucity of factual allegations underpinning this claim, it is possible that the Plaintiffs are attempting to raise a Free Exercise claim. Based on a review of the summary judgment record, however, the Court is satisfied that Plaintiffs are raising a First Amendment retaliation claim instead. *See* ECF No. 1-1, p. 3. And in any event, such a claim would fail as a matter of law, given the Third Circuit's clear holding that *Bivens* does not extend to claims brought under the Free Exercise Clause. *Mack v. Warden Loretto FCI*, 839 F.2d 286, 305 (3d Cir. 2016); *Rinaldi v. United States*, 904 F.3d 257, 263 n.6 (3d Cir. 2018).

Complaint also alleges that the Plaintiffs "face substantial retaliation & discrimination at the hands of their staff members." *Id.* While the factual basis of this claim is not particularly clear, Pauley stated at his deposition that Defendant Ashley threatened to "ship [him] out" of the institution if he did not cease his complaints about being able to practice his religion. *See* ECF No. 99-1, p. 24.

Defendants have filed a Notice of Supplemental Authority in which they argue that, in light of a recent Third Circuit decision, prisoners can no longer bring First Amendment retaliation claims against individually named defendants under *Bivens*. Neither Plaintiff has responded to this supplemental authority, and, in any event, the Court agrees with the Defendants that the Third Circuit's decision in *Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018) precludes the Plaintiffs' First Amendment *Bivens* claim. In *Bistrian*, the Court of Appeals unambiguously held that prisoners cannot bring First Amendment retaliation claims under *Bivens* against individually named defendants. Although such claims were previously permitted, the Third Circuit recognized that the Supreme Court's decision in *Ziglar* reversed its prior precedent permitting such actions. *Id.* at 95-96. This holding was recently reaffirmed. *See Jones v. Sposato*, 2019 WL 3546470, *2 (3d Cir. Aug. 5, 2019) ("In *Bistrian v. Levi*, we observed that '[t]he Supreme Court has never recognized a *Bivens* remedy under the First Amendment,' and concluded that special factors militated against recognizing such a remedy in the prison context because the prisoner's 'retaliation claim involves executive policies, implicates separation-of-power concerns, and threatens a large burden to both the judiciary and prison officials.'") (citations omitted). *See also Keller v. Walton*, 2019 WL 1513498, *2 (S.D. Ill. Apr. 8, 2019) (citing *Bistrian*).

15

In light of *Bistrian*, Plaintiffs' First Amendment retaliation claim is no longer viable in this Circuit. For that reason, Defendants Ashley and Glogau's Motion for Summary Judgment will be granted on this claim.

> b. Summary Judgment will be granted to the Defendants on Plaintiffs' Fifth Amendment Claim.

The Court now turns to the Plaintiffs' Fifth Amendment equal protection claim. Here, Pauley and Rhoades contend that the Defendants discriminated against them in the manner in which funds were apportioned among religious groups in the prison. For example, Pauley and Rhoades claim the Defendants misappropriated government program funding, and denied the Odinists "access to equity of funds expenditures to support Faith Groups Activities." *See* ECF No. 1-1, p. 4, ¶¶ 4-5. The Defendants argue that such a claim presents a "new context" under *Bivens*. ECF No. 96, p. 9-11. They also submit that alternative remedies exist and that special factors are present which counsel against extending *Bivens* to such a claim.

The Supreme Court has authorized *Bivens* actions for violations of the Fifth Amendment due process clause, which "forbids the Federal Government to deny equal protection of the laws." *Davis*, 442 U.S. at 234. "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 201 (1995). And the Third Circuit has recognized a *Bivens* action for "suits for damages brought under the equal protection component of the Due Process Clause of the Fifth Amendment . . . and the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Williams v. Ortiz*, 2019 WL 1384273, *3 (E.D. Pa. Mar. 27, 2019) (citing *Bistrian,* 696 F.3d at 365–66. Post *Ziglar*, however, additional scrutiny is required before a plaintiff may proceed with a *Bivens* action if the claims arise "in a new *Bivens* context." *Harris v. Dunbar*, 2018 WL 3574736, *2 (S.D. Ind. July 25, 2018) (citing *Ziglar*, 137 S. Ct. at 1864).

Here, Plaintiffs' Fifth Amendment equal protection claim does raise a new *Bivens* context. First, this claim is not remotely similar to the Fourth Amendment claim in *Bivens, supra.,* or the Eighth Amendment deliberate indifference claim in *Carlson, supra.*, both of which were permitted to proceed. And although a Fifth Amendment equal protection claim was allowed to go forward in *Davis, supra.*, that claim involved gender discrimination, not alleged religious discrimination. *See Davis*, 442 U.S. at 228.

Second, the Fifth Amendment claim here differs "in a meaningful way" from previous *Bivens* cases. *Ziglar*, 137 S. Ct. at 1859. The Plaintiffs' equal protection claim is unlike the unreasonable seizure, gender discrimination, and deliberate indifference claims recognized previously by the Supreme Court and implicates different constitutional rights. As Defendants point out, Plaintiffs' Fifth Amendment equal protection claim would extend a *Bivens* remedy to a new class of plaintiffs—prisoners who adhere to Odinism—as well as create a new class of defendants—federal prison officials. *See* ECF No. 96, p. 9. Thus, Plaintiffs' Fifth Amendment equal protection claim presents a new *Bivens* context. That determination mandates the next inquiry: "whether alternative remedies existed for the Plaintiffs through which their claims are protected." *See Wilkie v. Robbins*, 551 U.S. 537 (2007); *Alexander*, 2018 WL 1399302, *4.

The Supreme Court has refused to extend *Bivens* "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration[.]" *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988). Defendants argue that a "panoply" of alternative remedies exist which preclude a *Bivens* remedy for the Plaintiffs' equal protection claim. ECF No. 96, p. 13. The Court agrees. First, the Bureau of Prisons' Administrative Remedy Program provides alternative remedies, which the Plaintiffs availed themselves of. *See, e.g., White v. True*, 2019

17

WL 3074528, *3 (S.D. Ill. July 15, 2019) (BOP's administrative remedies program provides an alternative avenue for relief); *Brunson v. Nichols*, 2018 WL 7286410, *3 (W.D. La. Dec. 7, 2018) (collecting cases). Second, the Plaintiffs could have (and in fact did) utilized statutory remedies available under RFRA to pursue their equal protection claim. *See, e.g., Crowder v. Jones*, 2017 WL 5889717, *2 (S.D. Ind. Nov. 29, 2017) ("RFRA provides for 'appropriate relief' for governmental action that substantially burdens a person's exercise of religion.") (citing 42 U.S.C. § 2000bb-1). Lastly, various forms of injunctive relief and other equitable remedies were available to the Plaintiffs in federal court. For example, a habeas corpus petition affords them an alternative existing remedy. *See, e.g., Leibelson v. Collins*, 2017 WL 6614102, *11 (S.D.W. Va. Dec. 27, 2017) (vacated on other ground by *Leibelson v. Cook,* 761 Fed. Appx. 196 (4th Cir. 2019) (noting that "equal protection claims in federal prisons are often presented as habeas claims seeking injunctive relief"). All of these options are appropriate alternative remedies which the Plaintiffs could have used to litigate their Fifth Amendment equal protection claim. Therefore, the availability of these alternative remedies augur's hesitation in implying a *Bivens* remedy in this case. *See Ziglar,* 137 S. Ct. at 1858 ("if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action.")

Next, and "most critically," the Court should determine whether any "special factors" discourage the extension of *Bivens* to the Plaintiffs' claim. *Alexander*, 2018 WL 1399302, *4. It has been noted that

> When a case presents a new *Bivens* context, there will most often
> be factors that will cause a court to hesitate before allowing a
> damages action. As a consequence, the Supreme Court's decision
> in *Ziglar* is close to limiting the *Bivens* cause of action to the
> circumstances of *Bivens*, *Davis*, and *Carlson*, as it will be very

18

> difficult for any case not presenting those facts to survive [the
> *Ziglar*] test.

*Boudette v. Sanders*, 2019 WL 3935168, \*7 (D. Colo. Aug. 19, 2019). Though the Supreme

Court in *Ziglar* did not exhaustively enumerate other special factors counselling hesitation, it

noted that "separation-of-powers principles" were "particularly weighty." *Bistrian*, 912 F.3d at

90 (citing *Ziglar*, 137 S. Ct. at 1857-58). Other relevant special factors include "whether

Congress has already acted in th[is] arena, suggesting it does not 'want the Judiciary to

interfere'; whether a claim addresses individual conduct or a broader policy question; whether

litigation would intrude on the function of other branches of government; and whether national

security is at stake." *Id.* (quoting *Ziglar*, 137 S. Ct. at 1856-63). This point of inquiry presents a

"very low bar." *Boudette,* 2019 WL 3935168, \*7.

The Court finds that many of these special factors caution against recognizing a *Bivens*

action here. First, there is a concern about the associated costs. The Supreme Court has

explained that

> [c]laims against federal officials often create substantial costs, in
> the form of defense and indemnification. Congress, then, has a
> substantial responsibility to determine whether, and the extent to
> which, monetary and other liabilities should be imposed upon
> individual officers and employees of the Federal Government. In
> addition, the time and administrative costs attendant upon
> intrusions resulting from the discovery and trial process are
> significant factors to be considered.

*Ziglar*, 137 S. Ct. at 1856. The PLRA, 42 U.S.C. § 1997e *et seq.*, expresses Congress' concern

over the costs of prison litigation. The Supreme Court recognized that the PLRA "contains a

variety of provisions designed to bring [prisoner litigation in the federal courts] under control"

after a steep rise in filings. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Potential defense and

indemnification costs place a responsibility on Congress to "determine whether, and the extent to

19

which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Ziglar*, 137 S. Ct. at 1856. Congress has not yet enacted a statute analogous to 42 U.S.C. § 1983 to remedy all constitutional violations by federal actors, and there is little doubt that doing so would increase actions against individual officers and employees of the Federal Government. *See Ziglar*, 137 S. Ct. at 1862 ("in any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant ...").

Second, the separation of powers is a special factor counseling against the recognition of a *Bivens* action in this case. The Supreme Court insisted that courts carefully ask "who should decide" whether monetary damages are available for a particular wrong—Congress or the courts—noting that the "answer will most often be Congress." *Id.* at 1857. As to the claims raised and damages sought in this case, the Court finds Congress to be the appropriate decision-maker. Indeed, the Supreme Court has specifically recognized, "[t]he PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford*, 548 U.S. at 93 (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)). This is an "indication by Congress that the executive branch is best-suited to make decisions that concern prison administration." *Stiles v. United States*, 2019 WL 27072, *6 (Jan. 22, 2019). Therefore, this is another factor that counsels hesitation in recognizing a *Bivens* remedy in a new context of Fifth Amendment equal protection claims relating to allocation of federal prison funds for religious groups. *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("judicial deference is accorded [to prison administrators] ... because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.") (citations omitted).

In the aggregate then, special factors counsel hesitation in recognizing a *Bivens* remedy for this claim. Defendants' motion for summary judgment as to the purported Fifth Amendment equal protection *Bivens* claim will be granted.

                c.     Summary Judgment will be granted to the Defendants on Plaintiffs' Eighth Amendment Claim.

For similar reasons, the Court declines to extend a *Bivens* remedy to the Plaintiffs' Eighth Amendment claim. Here, Plaintiffs claim an Eighth Amendment violation based on the Defendants' refusal to provide them access to restrooms on occasion during their outdoor worship times. *See* ECF No. 1-1, p. 5.

This claim raises a new *Bivens* context. The claim does not resemble the three *Bivens* claims recognized by the Supreme Court. *Ziglar*, 137 S. Ct. at 1860. Although the claim at issue in *Carlson*, *supra.*, was based on the Eighth Amendment, it was based on an alleged failure to provide adequate medical care, not on the conditions of confinement. *See Karkalas*, 2019 WL 3492232, \*7. *See also Hanson v. United States*, 2018 WL 50460607, \*3 (E.D. Ky. Oct. 17, 2018) (holding that plaintiff's claimed violation of his right to use a bathroom is a new *Bivens* context). Thus, Plaintiffs' Eighth Amendment allegations present a "new context" for a *Bivens* claim. Special factors preclude the Court from extending *Bivens* to cover such allegations. *See Ziglar*, 137 S. Ct. at 1864 (holding that "even a modest extension [of *Bivens*] is still an extension.").

And as noted in the Court's discussion of the Plaintiffs' other constitutional claims, numerous alternative remedial structures—including the BOP's Administrative Remedy Program—were available to the Plaintiffs to attempt to remedy this alleged violation as well. The same "special factors," such as costs and the importance of the separation of powers, which this Court found to caution against extending a *Bivens* remedy on their First Amendment

retaliation and Fifth Amendment equal protection claims also precludes such an extension of *Bivens* for their Eighth Amendment claim relating to bathroom access. Thus, the Court declines to extend a *Bivens* remedy to this claim and will instead grant the Defendants' motion for summary judgment.[9]

C. Summary Judgment will be granted to the Defendants on the Plaintiffs' RFRA Claim.

Pauley and Rhoades also claim a violation of RFRA against Defendants Glogau, Samuels, Meeks, Barron, and Bailey. *See* ECF No. 1-1, p. 3. These Defendants argue that they are entitled to qualified immunity on this claim. The initial question before the Court is whether the defense of qualified immunity is applicable to RFRA claims.

1. The Defense of Qualified Immunity applies to RFRA Claims.

The "qualified immunity analysis looks through the rearview window, not the windshield." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017). That is "[t]he inquiry focuses on the state of the relevant law when the violation allegedly occurred." *Id.* Initially, the Court notes that there is some question, at least in this Circuit, whether qualified immunity may be raised as a defense to RFRA claims. *See Njos v. Carney*, 2017 WL 3224816, *9 (M.D. Pa. June 21, 2017) ("Although it is quite clear that the defendants can assert qualified immunity as a defense against the constitutional claims alleged, it is somewhat less certain that they may be entitled to rely on qualified immunity with respect to the RFRA claim."). The Third Circuit's non-precedential opinion in *Potts v. Holt*, 617 Fed. Appx. 148, 150-53 (3d Cir. 2015), highlights this uncertainty. In that case, the district court determined that the plaintiff's claimed violations of the Eighth Amendment failed and that the defendants

---

[9] Because the Court is granting the motion for summary judgment on the merits, it does not reach the Defendants' alternative qualified immunity argument as to those claims. *See, e.g., Ortiz*, 2018 WL 1399302, *8 n.6.

were otherwise entitled to qualified immunity on the plaintiff's First Amendment and RFRA claims. The Third Circuit reversed, in part. The Court of Appeals affirmed the dismissal of the Eighth Amendment claims, but concluded that the defendants had not—based on the limited factual record—sufficiently demonstrated that they were entitled to qualified immunity on the remaining First Amendment and RFRA claims. *Potts v. Holt*, 2017 WL 3431921, *1 (M.D. Pa. July 19, 2017). But the Third Circuit expressed no opinion on the merits of those claims or on whether, at some later stage, defendants might be entitled to qualified immunity. *See id.* Thus, the exact question whether qualified immunity can be used as a defense to RFRA claims was left unanswered.

Other Courts of Appeals which have considered this issue have found that the defense applies to RFRA claims. *See, e.g., Davila v. Gladden*, 777 F.3d 1198, 1208 (11th Cir.), *cert. denied sub nom. Davila v. Haynes*, 136 S. Ct. 78 (2015); *Walden v. Ctrs. for Disease Control and Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012) ("The defense of qualified immunity applies not only to constitutional claims, but also to claims brought for alleged violations of RFRA."); *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012) ("This case is an appropriate one for the recognition of the immunity defense because it would run counter to basic notions of notice and fair warning to hold that personal liability in such an unsettled area of law might attach. The following discussion underscores why it would be impermissible for us to conclude that the relevant law was clearly established in anything like a manner that would vitiate a qualified immunity defense. We thus dismiss [the Plaintiff's] RFRA claim on qualified immunity grounds."); *Rasul v. Myers*, 563 F.3d 527, 533 n. 6 (D.C. Cir. 2009) (per curiam) (holding, in the alternative, that federal officials were entitled to qualified immunity against claims brought for violations of RFRA); *Weinberger v. Grimes*, 2009 WL 331632, at *5 (6th Cir. Feb. 10, 2009)

23

(affirming district court's decision granting qualified immunity to a federal prison official on a RFRA claim). And district courts in this Circuit, as well as others, have also employed the qualified immunity analysis to resolve RFRA claims. *See, e.g., Romero v. Lappin,* 2011 WL 3422849, *2 (D. Ky. Aug. 4, 2011); *Jama v. United States,* 2010 WL 771789, at *8 (D. Wash. Mar. 2, 2010); *Harrison v. Watts,* 609 F. Supp.2d 561, 574–75 (E.D. Va. 2009) (holding, in the alternative, that the dismissal of the RFRA claim would be appropriate based on qualified immunity); *Njos,* 2017 WL 3224818, *8; *Jama v. I.N.S.,* 343 F. Supp. 2d 338, 376 (D.N.J. 2004). Thus, given this precedent, as well as the close legal congruence between First Amendment and RFRA claims, this Court will apply a qualified immunity analysis to the RFRA claims alleged herein. *See, e.g., Njos,* 2017 WL 3224816, *9.

2. The Defense of Qualified Immunity

Federal officials sued in the performance of their job duties are entitled to qualified immunity, and are shielded from monetary damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). This doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Wright v. City of Philadelphia,* 409 F.3d 595, 599 (3d Cir. 2005).

The qualified immunity inquiry is twofold: first, a court must determine whether the plaintiff has alleged sufficient facts to "make out a violation of a constitutional [or statutory] right." *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). [10] The second question is "whether the

---

[10] Qualified immunity has long been held applicable to alleged violations of statutory law as well. *See Harlow,* 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Davila v. Gladden,* 777 F.3d 1198, 1210 (11th Cir. 2015) ("Even if RFRA did authorize individual-capacity suits for money damages, these Defendants would be entitled to qualified immunity.").

24

right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Id.* (internal quotation marks omitted). In conducting this two-part inquiry, a court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand." *Id.* at 236. If the court finds that a claimed right was not clearly established at the time of the events alleged under the second prong of this test it need not definitively address the issue of whether a constitutional violation in fact occurred. *Id.* For purposes of this case, the first point of inquiry is determinative.

3.   Defendants Glogau, Samuels, Meeks, Barron, and Bailey Are Entitled to Qualified Immunity on Plaintiffs' RFRA Claims.

Defendants are entitled to qualified immunity because Pauley and Rhoades have failed to demonstrate that the Defendants violated their statutory rights under RFRA. Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, --- U.S. ---, 134 S. Ct. 2751, 2760 (2014)). RFRA precludes the "Government" from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the "Government" can "demonstrate[ ] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* (quoting 42 U.S.C. § 2000bb–1(a)–(b)). RFRA provides a private cause of action against the "government" for "appropriate relief." *Id.* (quoting 42 U.S.C. § 2000bb–1(c)). "Government" is defined as "includ[ing] a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* (quoting 42 U.S.C. § 2000bb–2(1)).

In enacting RFRA, Congress intended to incorporate the standard governing free exercise claims that prevailed in federal court before the Supreme Court's 1990 decision in *Employment*

25

*Division v. Smith*, 494 U.S. 872 (1990). *See City of Boerne v. Flores*, 521 U.S. 507, 515 (1997).

Congress thus aimed to restore what in its view is the right to the free exercise of religion that is guaranteed by the First Amendment to the Constitution, "both [in] substance and scope." *Rasul v. Myers*, 563 F.3d 527, 532-33 (D.C. Cir. 2009). Nevertheless, "[c]laims under the First Amendment and claims under the RFRA are analyzed separately." *Garraway v. Lappin*, 490 Fed. Appx. 440, 443 (3d Cir. 2012). When a prisoner asserts a First Amendment free exercise claim charging that "a prison policy is impinging on [his] constitutional rights," the courts must apply the four factor test set forth in *Turner v. Safley*, 482 U.S. 78 (1987), to determine whether the curtailment at issue is "reasonably related to penological interests." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (citing *Turner*, 482 U.S. at 89). In contrast, "a challenged restraint on the freedom of religion does not fall within the scope of the RFRA unless the inmate can establish that a 'substantial burden' is placed on his ability to exercise said freedom." *Garraway*, 490 Fed. Appx. at 444 (citing *Small v. Lehman*, 98 F.3d 762, 767 (3d Cir. 1996) (overruled on other grounds by *Boerne,* 521 U.S. 507).

The Third Circuit has explained that a "substantial burden" exists under RFRA where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. *See Pennsylvania v. President of the United States*, 930 F.3d 543, 572-73 (3d Cir. 2019) (citing *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 371 (3d Cir. 2017)); *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007). It is only once a substantial burden on religion has been established by the prisoner that the government must then establish "that it has a 'compelling

interest' in its actions and is furthering that interest by the 'least restrictive means.'" *Small*, 98 F.3d at 767 (citations omitted).

Pauley and Rhoades contend that these Defendants substantially burdened the exercise of their religion is several ways. First, they contend these Defendants prohibited them from worshiping. Next, they argue the Defendants substantially burdened the exercise of their religion by failing to provide them with venison for their annual Yule meal and thereby interfering with their religious diet. Third, the Plaintiffs maintain that the Defendants' failure to provide them with several items sacred to their faith substantially burdened the exercise of their religion. Finally, Pauley and Rhoades argue that the Defendants' failure to give them adequate access to religious texts substantially burdened the practice of their religion. However, the Plaintiffs have adduced no evidence showing that the Defendants burdened their ability to exercise their faith, substantially or otherwise. The Court will review each of the Plaintiffs' contentions, beginning with the alleged unlawful prohibitions on worship.

a.      Substantial Burden on Worship Ceremonies

Pauley stated that the Odinists at FCI McKean were denied the "sumbel," a drinking ritual, and Rhoades contended that the prison did not permit them to hold "fannings" outdoors.[11] ECF No. 99-1, p. 12; ECF No. 99-2, p. 124.[12] But the Plaintiffs admitted that the institution did permit them to:

---

[11] Rhoades described the weekly fannings: "for weekly fannings, you would go out and practice, from -- you would go out and practice what you were going to talk about that month, and your weekly fannings would be, you go out there and, say, for in a kindred, you would go out and make sure that the area that you were going to do your monthly meeting at was clean, you would prepare the fire pit, make sure that the wood was stacked up, maybe do the work around the Grove, which is where we do our meetings, we call it our Grove, we would make sure that everything was straight in the grove. If we had to replace something in the Grove, we would replace, say, like they needed, bring in a new rock for one of our walkways, we would do that." ECF No. 99-2, p. 10. Pauley testified that he did not know what a "sumbel" was, but that a "suna" was a "call for an outdoor practice." ECF No. 99-2, p. 17.

[12] Pauley's deposition testimony appears to contradict Rhoades'. Pauley stated that "we have a weekly fanning that we do, an outside fanning." ECF No. 99-1, p. 13.

1. worship once a month outdoors to perform "Blot" ceremonies; ECF No. 99-1, p. 13, 20;

2. maintain a worship circle, altar, and various stones in a designated outdoor worship area; ECF No. 99-2, p. 15;

3. build a fire and drink a mixture of honey and apple juice from a Mead Horn; ECF No. 99-2, p. 15;

4. hold weekly services and study sessions indoors in the prison chapel. ECF No. 99-1, p. 20.

Defendant Glogau's declaration supports these facts. He states that Bureau of Prison's policy dictates that "the two ceremonies Asatru/Odinists perform, i.e., Blots and Sumbels, can take place either indoors or outdoors, although outdoors . . . is the more natural setting for a Blot." ECF No. 99-3, p. 4, ¶ 11. He also declares that "[t]he Asatru/Odinist religious group at FCI McKean is afforded time and space for two religious services per week that are conducted at the indoor chapel." *Id.* at p. 5, ¶ 14. Glogau points out that this exceeds the once a week service contemplated by BOP policy and is the "same number of services allocated to all other religious groups at FCI McKean." *Id.* Further, Glogau confirms that along with these weekly indoor services, the Odinists at FCI McKean were given monthly outdoor services and were permitted to select the date on which they wished to hold their outdoor services. *Id.*, p. 5, ¶ 16. Glogau also states that the Odinists were provided an outdoor worship area, were permitted to have religious fires, and were allowed to maintain an altar, worship circle, and various stones in the designated area. *Id.*, p. 6, ¶ 20.

Defendant Glogau also explains that on two instances he had to cancel outdoor ceremonies planned by the Odinists. On February 11, 2015, Glogau canceled a planned Odinist outdoor service that month "because the wind chill that day was below 15 degrees." *Id.*, p. 6, ¶ 22. He accommodated the group by letting them perform their ceremony indoors. *Id.*

Additionally, fog conditions at the prison forced Glogau to cancel Odinist outdoor services for the Spring Equinox in 2015 because decreased visibility increased security concerns. *Id.*, p. 6, ¶ 23.

As noted above, Rhoades did not file a response challenging Defendant Glogau's declaration. Pauley did. He points to what he believes are various discrepancies within Glogau's declaration. For example, Pauley argues Glogau's statement that Odinists are permitted two services per week is a misrepresentation. ECF No. 113, p. 2. He instead claims that Glogau incorrectly subsumed the Odinists' weekly study session into their weekly service time, thus incorrectly stating that the Odinists are afforded twice weekly "services." *Id.* at p. 3. That is, the weekly study sessions are not worship sessions and the Odinists are only afforded one worship service a week, contrary to Glogau's declaration that they are afforded two. *Id.* Pauley himself acknowledges that BOP policy requires that the Odinist be provided one weekly indoor worship service time and time for one weekly study session. *Id.* at p. 2. He does not dispute that FCI McKean complied with this policy.[13] Pauley also does not dispute that Odinism requires no weekly observances. *See Hummel v. Donahue*, 2008 WL 2518268, *1 (S.D. Ind. June 19, 2008) (finding that while there are no required weekly observances for Odinists, they will often meet to study and perform rituals).

Pauley has not met his burden of identifying evidence sufficient to support a triable claim that the Defendants substantially burdened the exercise of the Plaintiffs' religion. *See, e.g.,*

---

[13] BOP Program Statement 5360.09, entitled Religious Beliefs and Practices, governs inmate religious practices within the BOP institutions. *See, e.g., Kyles v. Atkinson*, 2014 WL 4249878, *6 (D.S.C. Aug. 26, 2014) (citing Program Statement 5360.09). Pursuant to this program statement, inmates of all faith groups must be provided reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution. *Id.* Such opportunities are open to the entire inmate population, without regard to race, color, nationality, or ordinarily creed. *Id.* Scheduled religious activities are commensurate with the individual institution's mission/need. *Id.*

*Norwood v. Strada*, 249 Fed. Appx. 269, 271 (3d Cir. 2007). A government action imposes a substantial burden on religious exercise if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Washington,* 497 F.3d at 279 n.5 (citing *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)). Pauley's own submissions acknowledge that while Odinism does not require weekly services, Defendant Glogau provided its adherents with twice weekly opportunities to practice their faith. Pauley has thus not brought forth any evidence that Glogau substantially burdened the exercise of his religion and as a result cannot prove a violation of the RFRA.

Pauley also challenges Defendant Glogau's statement that Odinists at FCI McKean were permitted one outdoor worship service a month. *See* ECF No. 113, p. 3. Pauley contends that "in any given year, 2014, 2015, or 2016, the Odinist inmates were not provided with (12) outdoor services in the worship area," and that "no time when outdoor worship was cancelled or just not afforded, there was never a make-up day to allow the Odinist inmates worship." *Id.*, p. 3, 6. Despite these statements, Pauley has again failed to point to evidence that the Defendants substantially burdened the exercise of his religion.

First, he has not proffered any evidence establishing that Odinists are required (or entitled) to have outdoor worship. In fact, several courts have found the opposite, upholding bans on outdoor worship for Odinists. In *Krieger v. Brown*, for example, the Court of Appeals for the Fourth Circuit held that a defendant had not substantially burdened the exercise of an Odinist's faith by denying his request for an "outdoor worship circle." 496 Fed. Appx. 322, 326 (4th Cir. 2012). And in *Callaway v. Fink*, a case brought under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Court did not find a substantial burden on an Odinist inmate's practices when the prison banned all outdoor worship services. 2013 WL

1856471 (D. Mont. May 2, 2013).[14]  Given this precedent, and the undisputed fact that the

Plaintiffs were permitted outdoor worship once a month at FCI McKean, Pauley and Rhoades

have failed to establish that the Defendants' actions substantially burdened the exercise of their

religion.

Nor did Defendant Glogau's cancellation of two scheduled outdoor services due to

weather concerns substantially burden the exercise of the Plaintiffs' faith.  Pauley faults the

Defendants for cancelling these two outdoor services and not giving the Odinists a "make-up

day."  ECF No. 113, p. 6.  But courts have held that the cancellation of one or two services does

not amount to a substantial burden.  *See, e.g., Birdwell v. Cates*, 2012 WL 1641964, \*12 (E.D.

Cal. May 9, 2012) (finding that missing one service was not a substantial burden on the exercise

of the plaintiff's Odinist faith).  Nothing in the summary judgment record in this case reveals that

Odinists are required to have monthly outdoor services.  Rhoades acknowledged that Defendant

Glogau cancelled the Odinists' Winter Solstice ceremony in 2015 because of dangerously low

temperatures and out of concern for inmate health and safety.  Rhoades testified:

> Q:   What did Chaplain Glogau tell you when he denied your
>       request?
>
> A:   He said it was too cold out and that security said that there
>       was no reason for us to go out, with it being so cold.
>
> Q:   Do you remember how . . . what the weather was like in the
>       winter solstice of 2015?
>
> A:   I believe it was probably . . . well, being up on the
>       mountain there in McKean, with the  wind blowing, it was
>       probably about minus 10.

---

[14] That statute permits prisoners "to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Gonzales v. O Centro Espírita Beneficiente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006).  Thus, the Court may rely on cases interpreting RLUIPA when determining whether a defendant violated a plaintiff's rights under the RFRA.

ECF No. 99-2, p. 27. Rhoades also testified that the Spring Solstice of 2015 was cancelled

because of poor weather conditions, namely fog which hindered the prisons security efforts by

increasing the risk of inmate escape. *Id.*[15] In response to the Defendants' summary judgment

motion, Pauley acknowledged that he "understands that the reasons for the yard closure [wind

chill below 15 degrees and fog] is (sic) a legitimate reason to cancel outdoor worship." ECF No.

113, p. 6. Given this, there simply is no evidence of a substantial burden on the Plaintiffs' free

exercise rights. Thus, the record is insufficient to support a triable claim that the Defendants

violated the RFRA.

> b. Defendants' Dietary Restrictions Have Not Substantially
> Burdened Plaintiffs' Free Exercise.

Next, the Plaintiffs maintain that the Defendants violated the RFRA by failing to provide

them with venison for one of their annual Yule meals. Defendant Glogau explained the BOP's

policies on such meals in his declaration:

> With regard to ceremonial meals, FCI McKean's Institutional
> Supplement provides: "the observance once a year of a ceremonial
> meal by a religious group in the institution/camp will be permitted.
> A ceremonial meal schedule listing the date of each meal will be
> provided by the Chaplain to the Food Service Administrator
> ordinarily, prior to October 1st of each year. The food will be
> made available through Food Service's budget, not Religious
> Services. No outside foods will be purchased or donated for a
> ceremonial meal . . . The menu of a ceremonial meal will be taken
> from the Food Service institutional master menu."

---

[15] Although the record does not establish that the Odinists' 2016 Spring Equinox ceremony was canceled, Rhoades
did testify that he was not permitted to attend that service because his name was not included on the "call out" list,
which is a list that prison officials use to make sure inmates who are attending religious services are accounted for.
The Plaintiffs do not dispute that Defendant Glogau bears no responsibility for maintaining this list and Rhoades
concedes that he has no evidence that Glogau purposely omitted his name from the list on that date. ECF No. 99-2,
pp. 30-31 (attributing Rhoades' absence from the call-out list to "human error"). Thus, to the extent Glogau
neglected to include Rhoades' name on the call-out list on the day of the Spring Solstice, Rhoades has failed to
demonstrate that Glogau's error amounted to a substantial burden on his religious free exercise.

ECF No. 99-3, p. 7-8, ¶ 27. Glogau further described that the BOP's Technical Reference Manual sets out that the "Asatru/Odinist religion has no special dietary standards, though pork … is considered sacred to the God Frey, and is generally eaten at the Yule Feast." *Id.*, ¶ 28. *See also Peterson v. Barksdale*, 2017 WL 1207848, *3 (W.D. Va. March 31, 2017) (recognizing that no special dietary standards exist for Odinists, and that pork is considered sacred to Frey). Relating to the Odinists at FCI McKean, Defendant Glogau declared that, consistent with BOP policies, the institution holds annual ceremonial meals for Odinist inmates "in or around the Winter Solstice." ECF No. 99-3, p. 8, ¶ 29. Glogau acknowledges that "one year, the Asatru/Odinist inmates requested that they be served venison at their annual meal. That request was denied because venison is not included on the Food Service Institutional master menu. However, I ensured that the Asatru/Odinists received both beef and pork at their Yule meal." *Id.* Pauley's response to summary judgment does not dispute Glogau's declaration. Pauley admitted at his deposition that Odinists do not have any dietary restrictions or requirements: "we eat whatever we want, you know. Of course, if you – the more plain you eat, the more purified your body's going to be, of course, and live." ECF No. 99-1, p. 9. Rhoades' deposition testimony somewhat contradicts Pauley's. Rhoades stated that Odinism does have some dietary restrictions, but he did not explain what they were. ECF No. 99-2, p. 16. Instead, when asked about Odinism's dietary prescripts, he testified that

> We eat a lot of meat. We – for dietary instructions for us, is basically, we would like to at certain times eat pork, and it's just basically a lot of meat and vegetables . . . For our Yule meal, at the end of the year festival, we either have pork beef for our Yule . . . We had beef one time, and see, we were supposed to have venison, pork, beef and – venison, pork and beef.

*Id.*

33

Missing from the record, however, is any evidence showing that venison was central or sacred to Odinism in general or the Yule meal specifically. Neither Plaintiff testified that venison is sacred to the religion and there is nothing in record that so states. Neither Pauley's monograph on the religion nor the rites and rituals he attached thereto mention the use of venison. *See* ECF No. 99-3, pp. 227-363. Thus, the failure to provide venison to the Odinists on this one occasion could not have substantially burdened the Plaintiffs' religious exercise.

        c.      Defendants have not substantially burdened the Plaintiffs' access to religious/sacred items.

Pauley and Rhoades contend that the Defendants substantially burdened the exercise of their religion by denying them various items including: statues of the gods to be used in rituals, a gander stick, a ceremonial headdress, an altar cloth, and ceremonial oils. *See* ECF No. 99-2, p. 38 (headgear); p. 36 (gander stick); p. 14 (altar cloth); p. 35 (oils). Rhoades testified that these and other items were needed to practice their faith:

      Q:     . . . we talked a little bit about this, but could you walk me through some of the specific religious items that are integral to the practice of Odinism?

      A:     One, you would need a Thor's Hammer, two, you would need your runes, three, you would need your statues of your gods and goddesses, or you would need your altar cloth, and your altar, and you would also need your kindred flag. You would also need flag banners with the gods or the runes of the gods on them. You would need nature . . . and you would need your mead.

      Q:     Okay.

      A:     If you were locked - - if you were in the Bureau of Prisons, it would be apple juice.

*Id.* at p. 14. Pauley's deposition testimony differs somewhat. He explained that

      Q:     And there's some physical tools needed to practice each of these rituals; correct?

34

A:      Yeah.  Yes, sir.

Q:      Some, obviously not conducive to the prison environment?

A:      And we have to substitute the - - the actual tools, the - - for
        like wood or cardboard because of, you know, security
        reasons, of course.  Like, for instance, you have a hammer,
        the Thor's hammer, which is usually around - - no larger
        than 21 inches.  The gander, which is 24 inches.  It's about
        an inch wide, probably about half an inch think.  It's got
        runes running down it.  All right?  It sets the ritual area.

ECF No. 99-1, p. 13.  Pauley does not mention ceremonial headgear, oils, or the need for an altar
cloth in his deposition.

Defendant Glogau's declaration takes issue with the nature of these alleged deprivations,
contending that in large part, he acceded to the Odinists' requests.  Citing BOP records, Glogau
states that "the Religious Services Department at FCI McKean purchased a number of ritual
items for the Asatru/Odinist inmates, including: a Blot Bowl, Ash Wood Ruins [sic] an Oath
Ring, a Thor's Hammer, an 8 oz. Drinking Horn, and cartons of apple juice and honey to make
"mead." ECF No. 99-3, p. 9, ¶ 32 (citations to the record omitted).  Further, he declares that he
"personally asked that the carpentry unit at FCI McKean make a set of runes, a small Thor's
Hammer, an Oath Ring, a gander stick, and two bowls for the Asatru/Odinists to use for their
religious services." *Id.* at ¶ 33.  He also states that he provided the Odinists with a "white towel
to use as an altar cloth, consistent with BOP policy." *Id.* at ¶ 34.  As to the alleged deprivation of
religious statues, Glogau recalls an inmate making such a request and states that he pursued
obtaining them.  *Id.* at ¶ 35.  He further states that the inmate failed to provide him with follow-
up information as to which statues the inmate wished to order, telling Glogau that the wanted "all
of them." *Id.*  This response did not, according to Glogau, provide the chaplain with enough
information to place an appropriate order.  *Id.*

35

No substantial burden occurs if government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729, 739 (6th Cir.2007). On this claim, Plaintiffs have not met their burden by pointing to evidence from which a jury could reasonably conclude that the Defendants substantially burdened their religious exercise. First, neither Pauley nor Rhoades point to any evidence of record to refute Defendant Glogau's declaration. Indeed, Pauley actually acknowledges that Glogau obtained items such as a blot bowl, runes, an oath ring, Thor's Hammer, and a drinking horn for the Odinists by complaining that they had to be used in conjunction with Odinists at "the camp." *See* ECF No. 113, p. 8. This is akin to an admission that Glogau was working to enhance the religious exercise of all Odinists at the institution, not to substantially burden their worship practices.

Second, and more broadly, the Plaintiffs have not established that the Defendants' failure to provide these items substantially burdened the exercise of their faith. Simply put, the connection between these items and the Plaintiffs' religious belief "matters" under the statute. *Real Alternatives, Inc.*, 867 F.3d at 361 (citations omitted). In this case, the evidence of any connection is lacking. The Plaintiffs do not contend, nor provide any evidence from which a jury could conclude, that the deprivation of any of these items violated a precept of Odinism. Nor have they explained how these items are used or how their inability to use these items alters their religious practice.[16] *See, e.g., Webb v. California Dep't. of Corr.*, 2014 WL 7337434, *1, 7–8 (E.D. Cal. Dec. 23, 2014) (dismissing RLUIPA claims for failure to state a facially plausible

---

[16] The Plaintiffs do not have to prove and the Court does not ask whether the items at issue are "required or essential to his [or her] religion but [they] must at least demonstrate that the Defendants' denial of a particular religious ... observance was more than an inconvenience to [their] religious practice." *Tillman v. Allen*, 187 F. Supp. 3d 664, 673 (E.D. Va. 2016) (quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007)).

claim that denial of a hammer and sacred oils and herbs substantially burdened the practice of the plaintiffs' Asatru faith); *Maier v. Pall*, 2014 WL 1912194, \*12–13 (M.D. Pa. May 13, 2014) (granting summary judgment for defendants where the plaintiff failed to demonstrate that the denial of a Thor's Hammer substantially burdened his practice of Odinism).

The Court has thoroughly examined Pauley's monograph on Odinism. *See* ECF No. 99-3, p. 227-363. Section XII of his work is entitled "Personal Religious Worship Items Necessary" and explains that "in order to perform rituals & learning the practices of the Wotanism/Asatru Religion, one must be familiar with the following ritual items and tools." ECF No. 99-3, p. 346. Pauley goes on to list several items necessary for congregational worship. He notes twenty-three "ritual tools to be used during Rituals." *Id.* at p. 347. These include, but are not limited to, the Gandr, Thor's Hammer, a drinking horn, a bowl, an evergreen, an altar, the sunwheel, mead, runes, statues, kindred banners, blessing oils, an oath ring, and colored candles. *Id.* at p. 348. Pauley also minimizes the need for these items by explaining that some of them may be used to greater or lesser degrees, depending on their "congregational practices." *Id.* at 346. But Pauley also notes that "in a situation of incarceration, one may find themselves slightly limited to the bear (sic) essentials." *Id.* Thus, Pauley acknowledges that in circumstances such as incarceration, believers do not necessarily need all the items listed in his book to practice their faith. And the Odinists at FCI McKean were actually provided with many of the items listed as "bear (sic) essentials" like runes, altar cloths, Thor's Hammers, small wooden bowls, and various religious books and other devotional readings, as Defendant Glogau stated. Given this, the Plaintiffs have not established a factual record sufficient to sustain a claim that any deprivation of these religious items substantially burdened the practice of their faith.

Next, the Plaintiffs vaguely claim the Defendants violated the RFRA statute by
prohibiting them from having certain religious texts. Although their Complaint makes no
mention of religious texts, in their depositions, both Plaintiffs alleged that the Defendants
burdened the exercise of their faith by depriving them of access to certain religious books.
Pauley testified, for example, that "they've cut our - - libraries down to nothing." ECF No. 99-1,
p. 12. Later in his deposition, Pauley complained that the Defendants would not purchase "The
Book of Blotar" for Odinists at FCI McKean. *Id.* at p. 27. Pauley acknowledged, however, that
this particular book was available online. *Id.*

Once again, the Plaintiffs have not brought forth any evidence from which a jury could
reasonably conclude that the Defendants substantially burdened the exercise of their religion.
First, Pauley admitted that there are no required religious texts in order to practice Odinism: "the
only thing that we have as a guidebook is - - is like a - - a Poetic Edda, Hávamál. We don't
really have a Bible." ECF No. 99-1, p. 9. *See also* ECF No. 99-1, p. 12 ("you mentioned that
there was no Bible . . ."). Courts have also recognized that Odinism has no sacred texts which
are central to the faith. *See, e.g., Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (record did
not contain any evidence that certain books were important to Odinism).

Second, Pauley did not dispute that the Odinists at FCI McKean had access to numerous
works relating to the religion while incarcerated. In his declaration, Defendant Glogau states that
as Chaplain of the facility, he assisted Odinist inmates in obtaining numerous religious texts.
ECF No. 99-3, ¶ 30. He lists books and DVDs he obtained including, "Nibelungenlied," "Myths
of the Norsemen," "Gods and Myths of Northern Europe," "Eyrbggja," "Njal's Saga," "King
Herland's Saga," "Learn to Speak Icelandic," "Essential Asatru," "Odin's Chosen Handbook,"

38

"Norse Magic," "Rites of Odin," "Songs of Yggdrasil," "Creed of Iron,"[17] "The Masks of Odin," "Asatru Book of Blotar and Rituals," and "Viking Explorers (History Channel)." *Id.* Neither Plaintiff disputes these acquisitions or their availability.

Third, Pauley himself authored a "Guidebook" that he testified is all that the Odinists at FCI McKean needed to pursue their religious practices. *See* ECF No. 99-3, p. 227-363. Pauley stated that "you only need [his] handbook" to learn and practice Odinism and that he provides inmates with his handbook and study cards in order to help them understand the faith. ECF No. 99-1, p. 16. Given the foregoing record, the Plaintiffs have failed to support a triable claim that the Defendants have substantially burdened the Plaintiffs' exercise of their faith by denying them access to religious texts.[18]

Because the Plaintiffs cannot point to any evidence that the Defendants violated their statutory rights under the RFRA, the Defendants are entitled to qualified immunity on these claims.

While the foregoing conclusion makes it unnecessary to decide whether the rights asserted by the Plaintiffs were "clearly established" at the time of the Defendants' alleged conduct, the Court has considered that issue in the interest of completeness and concluded they

---

[17] The Court notes that other institutions have banned this book out of safety concerns. One Court related that "Creed of Iron" was "published by 14 Word Press, a company started by David Lane. Lane is currently serving a sentence in a Colorado prison for his part in the murder of a Jewish radio talk show host. Lane coined the fourteen-word phrase that is the inspiration for the name, 14 Word Press: 'We must secure the existence of our people and a future for white children.' The author and illustrator of 'Creed of Iron' is Ron McVan, a former member of the World Church of the Creator, a white supremacist group. *Borzych v. Frank*, 2005 WL 2206785, at *6 (W.D. Wis. Sept. 9, 2005).

[18] The only work specifically referenced by Pauley was "The Book of Blotar" from the Odinic Rite, which he stated was "drafted off of the - - the Asatru Alliance, Asatru Volk Assembly." ECF No. 99-1, p. 27. He provided no other information about this work and did not state who authored it, except to testify that it was available online. *Id.* Thus, the failure to provide this particular work did not substantially burden the Odinists' practice as Pauley acknowledges they could access it online. And to the extent that Pauley is referencing "The NPKA Book of Blotar," the Court observes that the prohibition of that book has been approved by various courts because it was non-religious and promotes white-supremacist violence. *See, e.g., Borzych*, 439 F.3d at 390.

were not. A right is "clearly established" for qualified immunity purposes when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original). "If no case speaks directly to the legality of the officer's conduct, the challenged conduct [needs] to be such that reasonable officers in the defendant['s] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." *Geist v. Ammary*, 40 F. Supp. 3d 467, 485 (E.D. Pa. 2014) (citing *Giuffre v. Bissell*, 31 F.3d 1241, 1255 (3d Cir. 1994)) (internal quotations omitted). Qualified immunity thus "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010) (internal quotation marks and citations omitted). For that reason, qualified immunity applies unless it is "beyond debate" that an officer acted unreasonably, *Mullenix v. Luna,* --- U.S. ---, 136 S. Ct. 305, 309 (2015), and unless "every reasonable official would [have understood] that what he [was] doing violate[d]" the right at issue. *Reichle v. Howards*, 566 U.S. 658 (2012) (internal quotation marks and citation omitted) (first alteration in original). As the Supreme Court clarified, while "[w]e do not require a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308. Further, in order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). "To determine if a right is clearly established, we first look for Supreme Court precedent. *Mammaro v. N.J. Div. of Child Protection and Permanency*, 814 F.3d 164, 169 (3d Cir. 2016). If there is none, we may rely on a "'robust consensus of cases of persuasive authority" in the Court[s] of

40

Appeals. *Id.* (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)). "[A]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *L.R.*, 836 F.3d at 248 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, (2002))." *Mirabella v. Villard*, 853 F.3d 641, 648–49 (3d Cir. 2017). In particular, when considering qualified immunity in the context of First Amendment claims, like those advanced here by Pauley and Rhoades courts "must not 'define clearly established law at a high level of generality.' *al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074." *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017). Instead, a court must look for factually congruent Supreme Court precedent, or at a minimum a "robust consensus of cases of persuasive authority," *Mammaro*, 814 F.3d at 169 (citation omitted), clearly establishing a First Amendment right in this particular factual context. Here, setting aside the Plaintiffs' failure to submit evidence that would permit a reasonable fact finder to find that their religious practice was substantially burdened, the Plaintiffs have failed to cite any decision establishing that Defendants' refusal to permit outdoor worship on one or two occasions, to have access to a bathroom during outdoor worship ceremonies, to eat venison, to have access to certain items, and to have certain religious texts available to them violated clearly established rights under the RFRA. Accordingly, the Court finds this as an additional and alternative basis for recognizing the Defendants' entitlement to qualified immunity and for the entry of summary judgment in their favor on Plaintiffs' RFRA claim.

VI.     Qualified Immunity/Lack of Personal Involvement

Defendants Samuels, Meeks, Barron, Bailey, Swanson, and Grimm argue that they are entitled to qualified immunity based on their lack of personal involvement. *See, e.g., Wilson v. Hoerner*, 2017 WL 6539368 (W.D. Pa. Dec. 21, 2017). But given that the Plaintiffs have no

41

viable *Bivens* action and have not brought forth sufficient evidence showing that the Defendants have substantially burdened their free exercise rights (and thus have no statutory claim under RFRA), the Court need not determine whether these Defendants are entitled to qualified immunity on the basis of their alleged lack of personal involvement.

VII.    Conclusion

In light of the foregoing, the Court will **GRANT** Defendants' Motion for Summary judgment in its entirety. An appropriate order will follow.

RICHARD A. LANZILLO
United States Magistrate Judge

Dated the 23rd day of September, 2019.